**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **EICKMEYER & ASSOCIATES, INC.**, | |
| Plaintiff, | Case No. _____ |
| v. | Jury Trial Demanded |
| **CAPSOL-EOP AS** and **CO2 CAPSOL AS**, | |
| Defendants. | |

## COMPLAINT

Plaintiff, Eickmeyer & Associates, Inc. ("Eickmeyer"), for its Complaint against Defendants, Capsol-EoP AS and CO2 Capsol AS (collectively, "Capsol"), alleges as follows:

### INTRODUCTION

1.     Eickmeyer brings this action to remedy Capsol's violations of Eickmeyer's intellectual-property rights in important climate-change technology involving the removal of carbon dioxide ("$CO_2$") in exhaust gases generated by power plants and from other industrial processes. As a result of years of hard work and creativity, Eickmeyer and its predecessor invented, developed, and commercialized technology that reduces the energy consumed during the removal of $CO_2$ from exhaust gases, thus making the removal process more economically feasible.

2.     Eickmeyer disclosed the technology it had developed to Capsol's parent corporation and predecessor under the terms of agreements that were intended to allow

1

the parties to jointly commercialize the technology while continuing to protect the technology as a trade secret. Capsol violated the confidentiality provisions of those agreements and, without the prior knowledge or authorization of Eickmeyer, patented Eickmeyer's technology in the United States and other countries, naming a Capsol employee as the sole inventor of Eickmeyer's technology.

3. Capsol's misconduct only came to light in connection with a CO2 removal project where Capsol notified Eickmeyer's customer that the project as designed would infringe on the Capsol patent. Eickmeyer then notified Capsol that it had discovered Capsol's misconduct. In response, Capsol denied it was in possession of Eickmeyer's technology and misrepresented the manner in which it obtained the technology it had improperly disclosed and patented.

4. Eickmeyer now seeks to correct the inventorship of U.S. Patent No. 10,391,447 ("the '447 patent"), which was improperly obtained by Capsol, by listing Eickmeyer's employee as the sole inventor or, alternatively, as a joint inventor. Eickmeyer further seeks to hold Capsol accountable for misappropriating Eickmeyer's trade secrets and for breaching the agreement protecting those trade secrets, all to Eickmeyer's detriment.

## THE PARTIES

5. Eickmeyer is a Kansas corporation with a principal place of business at 1201 Wakarusa Drive, Suite C3-D, Lawrence, Kansas 66049.

6. Capsol-EoP AS is a Norwegian limited company with a principal place of business at Madserud Avenue 2, Oslo, Norway 0274.

2

7.      CO2 Capsol AS is a Norwegian limited company with a principal place of business at Madserud Avenue 2, Oslo, Norway 0274.

8.      Upon information and belief, Capsol-EoP AS and CO2 Capsol AS are under common control and are the alter egos of one another. Although Capsol-EoP AS is the current assignee of record of the '447 patent, CO2 Capsol AS claims intellectual-property rights in the "Capsol EoP (End of Pipe) patent." A copy of the "About" page of the CO2 Capsol AS website (https://www.co2capsol.com/about) is attached as Exhibit A. The CO2 Capsol AS website also recites the "history behind the development of the Capsol EoP (End of Pipe) proprietary rights" and states that CO2 Capsol AS's mission is "[t]o be a major contributor to solving one of our biggest global challenges; climate change, with our patented Capsol EoP (End of Pipe) carbon capture technology."

9.      CO2 Capsol AS's claim of intellectual-property rights in the '447 patent is not limited to its website. In February 2022, CO2 Capsol AS demanded a license fee under the European counterpart of the '447 patent from one of Eickmeyer's customers, notwithstanding the fact that Capsol-EoP AS—not CO2 Capsol AS—is the assignee of record for the European counterpart of the '447 patent.

10.     Capsol-EoP AS and CO2 Capsol AS have also disregarded corporate formalities in their dealings with Eickmeyer. As an example, both Capsol-EoP AS and CO2 Capsol AS have entered into a contract and otherwise done business with Eickmeyer as "Capsol AS," although "Capsol AS" is not registered with the Norway Register of Business Enterprises as the actual or fictitious name of any business entity.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

11.     Eickmeyer brings causes of action against Capsol for correction of inventorship of the '447 patent pursuant to 35 U.S.C. § 256; for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Kansas Uniform Trade Secrets Act, Kan. Stat. Ann. § 60-3320 *et seq.*; and for breach of contract.

12.     This Court has subject-matter jurisdiction over the correction-of-inventorship cause of action under at least 28 U.S.C. §§ 1331 and 1338(a).

13.     This Court has subject-matter jurisdiction over the Defend Trade Secrets Act cause of action under at least 18 U.S.C. § 1836 *et seq.*

14.     This Court has subject-matter jurisdiction over the state-law causes of action for misappropriation of trade secrets and breach of contract under at least 28 U.S.C. §§ 1332 and 1367.

15.     This Court has personal jurisdiction over Capsol-EoP AS under Fed. R. Civ. P. 4(k)(1)(C) because such jurisdiction is authorized by 35 U.S.C. § 293. Capsol-EoP AS is the current assignee of record of the '447 patent. Capsol-EoP AS does not reside in the United States and has not filed a written designation of an agent in the United States on whom may be served process or notice of proceedings affecting the patent rights of the '447 patent.

16.     This Court has personal jurisdiction over CO2 Capsol AS because it is the alter ego of Capsol-EoP AS. Thus, the contacts of Capsol-EoP AS are imputed to CO2 Capsol AS and vice versa, thereby conferring personal jurisdiction upon CO2 Capsol AS pursuant to Fed. R. Civ. P. 4(k)(1)(C) as authorized by 35 U.S.C. § 293.

17.     In the alternative, this Court has personal jurisdiction over CO2 Capsol AS under Fed. R. Civ. P. 4(k)(2) to the extent that CO2 Capsol AS is not subject to jurisdiction in any state's courts of general jurisdiction, because the exercise of such jurisdiction by this Court is consistent with the United States Constitution and laws.

18.     Venue is proper in this District under at least 28 U.S.C. §§ 1391(b)(3) and 1391(c)(3) and 35 U.S.C. § 293.

<u>**ALLEGATIONS COMMON TO ALL COUNTS**</u>

**A.     Eickmeyer Develops the Trade-Secret CATACARB® Process**

19.     Beginning in the early 1960s, Allen G. Eickmeyer developed an improved process for removing acid gases such as $CO_2$ and hydrogen sulfide from gas streams produced in ammonia and hydrogen plants and other applications. This is known as the CATACARB® process. Mr. Eickmeyer patented many features of the CATACARB® process, but the underlying data and other information he developed that allows the CATACARB® process to be adapted to meet the conditions present at specific plants has always been closely guarded as a trade secret.

20.     Mr. Eickmeyer transferred ownership of all rights in the CATACARB® process and the underlying data and other information to Eickmeyer & Associates, Inc. in 1990, and Eickmeyer continues to commercialize and improve upon the CATACARB® process. To date, the CATACARB® process has been employed in over 150 plants in over 30 countries around the world.

21.     One of those improvements that results in further energy savings in the CATACARB® process is referred to as the Stripump Technology, which was developed by Eickmeyer's then-employee I-Meen Chao.

**B.     Eickmeyer Confidentially Discloses Its Trade Secrets to Capsol's Parent Company, Sargas, So Sargas Can Evaluate the CATACARB® Process.**

22.     In January 2010, Eickmeyer's Mr. Chao began communicating with representatives of the Norwegian corporation Sargas AS and its U.S. affiliate Sargas, Inc. (collectively "Sargas") regarding whether the CATACARB® process could be used on projects that Sargas was working on to remove CO2 from flue gases generated by power plants. Sargas AS subsequently established Capsol-EoP AS and CO2 Capsol AS as its subsidiaries.

23.     Eickmeyer and Sargas entered into a Secrecy Agreement dated March 10, 2010 (the "2010 Secrecy Agreement"), which imposed restrictions on Sargas's use of confidential information it would receive from Eickmeyer regarding the CATACARB® process. Specifically, Sargas agreed to use the information "only for the purpose of evaluating this [CATACARB®] Process, not to use this information commercially except with [Eickmeyer's] permission, and not to disclose this information to others except with [Eickmeyer's] written consent."

24.     Eickmeyer's Mr. Chao was requested to and, in reliance on the secrecy restrictions imposed on Sargas in the 2010 Secrecy Agreement, did send detailed and confidential design proposals and other information to Sargas that revealed the specific processing parameters and process flow diagrams that could be used to implement the

CATACARB® process for the specific projects Sargas was working on. Each of those proposals was prominently marked with a "CONFIDENTIAL" legend.

25.    As the relationship between Eickmeyer and Sargas AS further progressed, they entered into an Agreement dated March 26, 2012 (the "2012 Agreement"), under which Eickmeyer licensed to Sargas AS the right to use Eickmeyer's confidential information and patent rights relating to the CATACARB® process in exchange for payments to be made by Sargas AS to Eickmeyer for license and consulting fees. As was the case in the 2010 Secrecy Agreement, the 2012 Agreement imposed obligations on Sargas AS to safeguard the secrecy of Eickmeyer's confidential information.

26.    Between March 2010 and March 2013, Eickmeyer sent many detailed and confidential design proposals and other information for the CATACARB® process to Sargas. This information was marked with the "CONFIDENTIAL" legend and was subject to the confidentiality and non-use protections of the 2010 Secrecy Agreement and the 2012 Agreement.

27.    The confidential information relating to the CATACARB® process that were disclosed by Eickmeyer to Sargas between March 2010 and March 2013 could not have been independently developed by Sargas. This was evidenced by a March 25, 2013 email sent by Stellan Hamrin to Eickmeyer's Mr. Chao. Mr. Hamrin was listed on Sargas AS's website as a member of its technical team with the title Senior Specialist Engineer. In that email, Mr. Hamrin reported that he had attempted to replicate one of the process design proposals supplied by Mr. Chao but had been unable to do so using process

simulation software. He then posed a number of technical questions to Mr. Chao and closed the email by stating, "I hope you can straighten these question marks out for me."

**C.    Before Declaring Bankruptcy, Sargas Transfers Intellectual Property to Its Capsol Subsidiaries, Who Secretly Patent Eickmeyer's Stripump Technology**

28.    The collaboration between Eickmeyer and Sargas ended when Sargas AS experienced financial difficulties and was declared bankrupt on November 6, 2015.

29.    Prior to that bankruptcy, Sargas AS established two Norwegian corporations as its subsidiaries: CO2 Capsol AS in December 2014 and Capsol-EoP AS in September 2015. CO2 Capsol AS, in a description of its history in a September 2021 Company Presentation, alleged that it "t[ook] over patents and technical staff from Sargas" in 2014.

30.    In a February 2015 agreement, Sargas AS assigned intellectual property rights to its subsidiary CO2 Capsol AS.

31.    On February 6, 2015, Sargas AS assigned its U.S. patents and patent applications to CO2 Capsol AS.

32.    On September 8, 2015, Sargas AS's other subsidiary, Capsol-EoP AS, filed Norwegian patent application 20151155, entitled "Method and Plant for CO2 Capture" (the "Norway Application"), and falsely named Mr. Hamrin as the sole inventor. Mr. Hamrin was the Senior Specialist Engineer for Sargas AS and later was one of the "core staff members" of CO2 Capsol AS.

33.    Capsol-EoP AS's Norway Application was based on and disclosed Eickmeyer's detailed confidential information relating to process conditions and

equipment used in the CATACARB® process and sought to patent the Stripump Technology that Eickmeyer had disclosed to Sargas and to Mr. Hamrin under the strict secrecy obligations of the 2010 Secrecy Agreement and the 2012 Agreement.

34.     On September 6, 2016, Capsol-EoP AS filed an international patent application based on, and containing the same information in, the Norway Application.

35.     On August 27, 2019, the '447 patent issued to Capsol-EoP AS from that international application with claims directed to Eickmeyer's Stripump Technology. Patents also issued in other countries from that international application.

36.     The '447 patent also falsely named Mr. Hamrin as the sole inventor, even though he unquestionably knew that the Stripump Technology claimed in the patent was sent to him from, and was developed by, Eickmeyer.

37.     Mr. Chao is the true sole inventor of the invention as claimed in the '447 patent.

38.     Alternatively, Mr. Chao is a joint inventor of the invention as claimed in the '447 patent.

39.     Mr. Chao has an obligation to assign his inventions, including those relating to the Stripump Technology, to Eickmeyer.

40.     Capsol-EoP AS's filing of the Norway Application and the international application, and obtaining the '447 patent and corresponding patents in other countries, were all done without the knowledge or authorization of Eickmeyer and were done in breach of the secrecy obligations in both the 2010 Secrecy Agreement and the 2012 Agreement.

**D.      Capsol Continues to Do Business with Eickmeyer As It Misappropriates Eickmeyer's Technology**

41.     Following Sargas AS's bankruptcy and unaware of Capsol's patent filings, Eickmeyer was approached by a representative of "Capsol A/S [*sic*] (former Sargas A/S, former Newbranch consulting)" on June 11, 2018, seeking a proposal for the use of the CATACARB® process on a project in Norway.

42.     Eickmeyer agreed to submit a proposal and, before doing so, entered into a Secrecy Agreement with "Capsol AS [*sic*]" (the unregistered name under which both Capsol-EoP AS and CO2 Capsol AS have done business) dated June 20, 2018 (the "2018 Secrecy Agreement"). The 2018 Secrecy Agreement imposed the same restrictions on Capsol's use of confidential information regarding the CATACARB® process as had previously been agreed to by Sargas AS, in the 2010 Secrecy Agreement.

43.     Eickmeyer emailed its detailed and confidential design proposal for implementing the CATACARB® process to the representative of "Capsol AS" on June 22, 2018. The design proposal was marked with the "CONFIDENTIAL" legend and was subject to the confidentiality and non-use protections of the 2018 Secrecy Agreement.

44.     On August 20, 2018, Mr. Hamrin, now acting as a "represent[ative] of CapSol Engineering, the engineering branch of CapSol AS [*sic*]," contacted Eickmeyer by email, stating "We have some business opportunities and need to present a reference list of your projects related to your [CATACARB®] process. We suspect that the list we have is outdated and would like you to send your latest reference list." Eickmeyer responded the same day and provided its most recent CATACARB® plant list.

10

45.    On October 15, 2018, Mr. Hamrin contacted Eickmeyer by email requesting a design proposal "for a Stockholm Exergy [*sic*, Exergi] project to capture $CO_2$ from their bio fuel plant in Stockholm."

46.    On November 20, 2018, Eickmeyer emailed its design proposal for the Stockholm Exergi project to Mr. Hamrin. The design proposal was marked with the "CONFIDENTIAL" legend and was subject to the confidentiality and non-use protections of the 2018 Secrecy Agreement.

## E.    Capsol Misrepresents How It Learned About Eickmeyer's Technology

47.    In November 2020, during discussions relating to the Stockholm Exergi project, Eickmeyer was made aware for the first time that Capsol had improperly obtained the '447 patent and corresponding patents in other countries.

48.    Eickmeyer subsequently communicated with Capsol in an effort to reach a negotiated resolution of the dispute resulting from Capsol's secretly obtaining the '447 patent and corresponding patents in other countries and disclosing Eickmeyer's proprietary, confidential, and trade-secret information in those patents.

49.    In a response to Eickmeyer's communications, counsel for CO2 Capsol AS asserted in a letter dated May 20, 2022:

> CO2 Capsol purchased certain carbon capture and storage technology (the "IPR") from the bankruptcy estate of the former Norwegian company Sargas AS. The agreement regarding sale and purchase of the IPR is dated February 2015. CO2 Capsol has not at any point in time been a party to any agreement, neither [*sic*] orally nor [*sic*] written, with Eickmeyer. Neither has CO2 Capsol

11

according to Norwegian law become a successor of Sargas AS due to the purchase of the IPR. Consequently, your referral to CO2 Capsol as contractually bound by an agreement with Eickmeyer, and thereby constrained by the terms and conditions of such agreement, is incorrect.

50.     Counsel's assertions in the May 20, 2022 letter are incorrect for at least two reasons. First, Sargas AS was not declared bankrupt until November 6, 2015, so the earlier agreement in February 2015 by which CO2 Capsol AS was alleged to have acquired the Sargas IPR must have been with Sargas AS rather than the bankruptcy estate for Sargas AS.

51.     Second, the 2018 Secrecy Agreement was signed by Einar Chr. Lange on behalf of "Capsol AS"—the unregistered fictitious name under which CO2 Capsol AS has done and continues to do business. Mr. Lange is listed on the CO2 Capsol AS website as a board member since 2015 and "the main investor in CO2 Capsol AS." A copy of the "Organization" page of the CO2 Capsol AS website (https://www.co2capsol.com/organization) is attached as Exhibit B. Thus, counsel's statement in the May 20, 2022 letter that "CO2 Capsol has not at any point in time been a party to any agreement, neither orally nor written, with Eickmeyer" is false.

52.     In a further effort to distance itself from Sargas, CO2 Capsol AS quickly altered its website by removing Mr. Hamrin's name and biography from the list of individuals in its organization once Eickmeyer notified Capsol that Mr. Hamrin had received Eickmeyer's confidential design proposals relating to the CATACARB® process while he was Sargas's Senior Specialist Engineer.

53.     The negotiations seeking to resolve the dispute between Eickmeyer and Capsol were unsuccessful, and subsequent events confirmed Eickmeyer's fears that the '447 patent and corresponding patents in other countries would interfere with Eickmeyer's future business opportunities involving the CATACARB® process.

**F.     Capsol's Improperly Obtained Patent Harms Eickmeyer's Business**

54.     In July 2021, Eickmeyer entered into an agreement with Petrofac Facilities Management Ltd ("Petrofac") relating to the use of Eickmeyer's CATACARB® process on the Stockholm Exergi project first brought to Eickmeyer's attention by Mr. Hamrin on October 15, 2018. Pursuant to that agreement, Eickmeyer provided a final CATACARB® process design package for the plant being developed by Stockholm Exergi AB to remove $CO_2$ from flue gases generated by a combined heat and power plant.

55.     In September 2021, $CO_2$ Capsol AS and Petrofac publicly announced that they "are currently working together on a planned $CO_2$ capture facility at one of Stockholm Exergi's combined heat and power plants in Sweden," that Stockholm Exergi had "selected $CO_2$ Capsol's End of Pipe (EoP) solution as its capture technology," and that "Petrofac will integrate $CO_2$ Capsol's technology" in the front-end study for the project.

56.     After Eickmeyer had delivered its final CATACARB® process design package, representatives of Petrofac and Stockholm Exergi AB suddenly contacted Eickmeyer on February 16, 2022 and expressed alarm and dismay regarding "$CO_2$ Capsol's infringement claim" and "claim for a license payment" that $CO_2$ Capsol AS had recently and unexpectedly made relating to the European counterpart of the '447 patent.

13

During those discussions, the representatives of Petrofac and Stockholm Exergi expressed their expectation that Eickmeyer would work with Capsol in an effort to resolve Capsol's claims.

57.    CO2 Capsol AS's demand to receive a patent license fee from Eickmeyer's customer Stockholm Exergi demonstrates the monetary peril and loss of goodwill faced by Eickmeyer as it seeks to continue with its business involving the CATACARB® process in the face of CO2 Capsol AS's demand for a license payment for patent rights that rightfully belong to Eickmeyer.

## COUNT I
### Correction of Inventorship of the '447 Patent

58.    Eickmeyer incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

59.    Capsol-EoP AS is the record owner by assignment of all rights in the '447 patent.

60.    Mr. Chao invented the subject matter claimed in the '447 patent on his own and is the sole inventor of all the claims in the '447 patent.

61.    In the alternative, Mr. Chao invented the subject matter claimed in the '447 patent in collaboration with Mr. Hamrin and is the joint inventor of all the claims in the '447 patent.

62.    Mr. Chao is not listed as the sole inventor or as a joint inventor on the '447 patent.

14

63.     The omission of Mr. Chao as the sole inventor on the '447 patent occurred without Mr. Chao's knowledge, much less any deceptive intent on the part of Mr. Chao.

64.     In the alternative, the omission of Mr. Chao as the joint inventor on the '447 patent occurred without Mr. Chao's knowledge, much less any deceptive intent on the part of Mr. Chao.

65.     To reflect the true and correct inventorship of the claimed invention in the '447 patent, and to secure Eickmeyer's lawful rights thereto, Eickmeyer seeks an order correcting the inventorship to name Mr. Chao as the sole inventor, or alternatively to name Mr. Chao and Mr. Hamrin as joint inventors.

## COUNT II
## Misappropriation of Trade Secrets – Defend Trade Secrets Act

66.     Eickmeyer incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

67.     Eickmeyer owns certain confidential, proprietary, and trade-secret information relating to the CATACARB® process, as alleged above.

68.     Eickmeyer has taken reasonable measures to keep such information secret and confidential. The physical files that contain Eickmeyer's confidential, proprietary, and trade-secret information relating to the CATACARB® process are kept in locked offices and are accessible only to employees of Eickmeyer. The digital backups of that information are guarded by password-protected servers, which are accessible only to Eickmeyer employees. All Eickmeyer customers that receive CATACARB® process design information are required to sign secrecy and non-disclosure agreements.

Eickmeyer further requires employees to sign a Secrecy Agreement, both at the beginning of their employment and upon termination of their employment.

69.     As a result of these measures, Eickmeyer's confidential, proprietary, and trade-secret information is not available for others to use other than under a license from Eickmeyer or pursuant to the limited terms of an agreement such as the 2010 Secrecy Agreement, 2012 Agreement, and/or 2018 Secrecy Agreement.

70.     As evidenced by the CATACARB® process being commercialized in over 150 plants in over 30 countries around the world, Eickmeyer's confidential, proprietary, and trade-secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from the disclosure or use of the information.

71.     In violation of Eickmeyer's rights, Capsol has intentionally and fraudulently misappropriated Eickmeyer's confidential, proprietary, and trade-secret information in the improper and unlawful manner alleged herein, in violation of at least 18 U.S.C. § 1836.

72.     On information and belief, if Capsol is not enjoined, it will continue to misappropriate and use Eickmeyer's trade-secret information to its own benefit and to Eickmeyer's detriment.

73.     As a direct and proximate result of Capsol's misappropriation, Eickmeyer has suffered and, if Capsol's misconduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and damages in excess of $75,000.

16

74.     Because Eickmeyer's remedy at law is inadequate, Eickmeyer seeks, in addition to an award of damages pursuant to 18 U.S.C. § 1836(b)(3)(B), injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to recover and protect its confidential, proprietary, and trade-secret information and to protect its legitimate business interests.

75.     Capsol's misappropriation of Eickmeyer's confidential, proprietary, and trade-secret information was and continues to be willful, malicious, and in bad faith. Accordingly, Eickmeyer is entitled to an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of its reasonable attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

<u>COUNT III</u>
**Misappropriation of Trade Secrets – Kansas Uniform Trade Secrets Act**

76.     Eickmeyer incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

77.     Eickmeyer owns certain confidential, proprietary, and trade-secret information relating to the CATACARB® process, as alleged above.

78.     Eickmeyer has taken reasonable measures to keep such information secret and confidential, as alleged above.

79.     As a result of these measures, Eickmeyer's confidential, proprietary, and trade-secret information is not available for others to use other than under a license from Eickmeyer or pursuant to the limited terms of an agreement such as the 2010 Secrecy Agreement, 2012 Agreement, and/or 2018 Secrecy Agreement.

80.   As evidenced by the CATACARB® process being commercialized in over 150 plants in over 30 countries around the world, Eickmeyer's confidential, proprietary, and trade-secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from the disclosure or use of the information.

81.   In violation of Eickmeyer's rights, Capsol has intentionally and fraudulently misappropriated Eickmeyer's confidential, proprietary, and trade-secret information in the improper and unlawful manner alleged herein, in violation of at least Kan. Stat. Ann. § 60-3321.

82.   On information and belief, if Capsol is not enjoined, it will continue to misappropriate and use Eickmeyer's trade-secret information to its own benefit and to Eickmeyer's detriment.

83.   As a direct and proximate result of Capsol's misappropriation, Eickmeyer has suffered and, if Capsol's misconduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in excess of $75,000.

84.   Because Eickmeyer's remedy at law is inadequate, Eickmeyer seeks, in addition to damages pursuant to Kan. Stat. Ann. § 60-3322(a), injunctive relief pursuant to Kan. Stat. Ann. § 60-3321 to recover and protect its confidential, proprietary, and trade-secret information and to protect its legitimate business interests.

85.   Capsol's misappropriation of Eickmeyer's confidential, proprietary, and trade-secret information was and continues to be willful, malicious, and in bad faith. Accordingly, Eickmeyer is entitled to an award of exemplary damages pursuant to

Kan. Stat. Ann. § 60-3322(b) and an award of its reasonable attorney's fees pursuant to Kan. Stat. Ann . § 60-3323.

<u>COUNT IV</u>
**Breach of Contract**

86.     Eickmeyer incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

87.     Capsol is bound by the terms of the 2010 Secrecy Agreement, the 2012 Agreement, and the 2018 Secrecy Agreement (collectively, the "Agreements").

88.     Together, the Agreements constitute a valid and enforceable contract.

89.     In the alternative, each of the Agreements constitutes a valid and enforceable contract.

90.     In the alternative, any two of the Agreements together constitute a valid and enforceable contract.

91.     As described more fully above, Capsol agreed to abide by, among others, the confidentiality provisions in the Agreements.

92.     Capsol has breached and continues to breach its confidentiality obligations to Eickmeyer under the Agreements by using Eickmeyer's confidential, proprietary, and trade-secret information commercially and for purposes other than evaluation of the CATACARB® process and by disclosing that information to others, all without the permission or consent of Eickmeyer.

93.     Capsol's breaches of its contractual obligations have caused Eickmeyer to suffer competitive harm, irreparable injury, and damages in excess of $75,000.

19

94.    Because Eickmeyer's remedy at law is inadequate, Eickmeyer seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade-secret information and to protect its legitimate business interests.

## PRAYER FOR RELIEF

Based on the foregoing, Eickmeyer respectfully requests the following relief:

(a)    An order correcting the inventorship of the '447 patent to name Mr. Chao as the sole inventor or, in the alternative, name Mr. Chao as a joint inventor with Mr. Hamrin;

(b)    An order directing Capsol to correct the inventorship in all foreign patents corresponding to the '447 patent to name Mr. Chao as the sole inventor or, in the alternative, name Mr. Chao as a joint inventor with Mr. Hamrin;

(c)    Imposition of a constructive trust requiring Capsol to hold the '447 patent and corresponding foreign patents for the benefit of Eickmeyer;

(d)    Judgment in Eickmeyer's favor and against Capsol on all causes of action alleged herein;

(e)    An order requiring Capsol to return to Eickmeyer any and all documents, including electronically stored documents, containing the trade-secret information of Eickmeyer;

(f)    An award of Eickmeyer's actual damages in an amount to be proven at trial;

(g)    An award of pre-judgment and post-judgment interest on the damages assessed;

(h)     A determination that this is an exceptional case under 35 U.S.C. § 285;

(*i*)     An award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and/or Kan. Stat. Ann. § 60-3322(b);

(j)     An award of Eickmeyer's reasonable attorney's fees pursuant to 35 U.S.C. § 285, 18 U.S.C. § 1836(b)(3)(D), and/or Kan. Stat. Ann. § 60-3323;

(k)     An award of Eickmeyer's costs incurred in this action; and

(*l*)     Such other and further relief as the Court or a jury deems just and proper.

## JURY DEMAND

Eickmeyer demands a trial by jury of all matters on which it is entitled to a jury trial under Fed. R. Civ. P. 38.

Respectfully Submitted,

August 26 , 2022

/s/_____

Dana D. McDaniel (VSB No. 25419)
 dmcdaniel@spottsfain.com
John M. Erbach (VSB No. 76695)
 jerbach@spottsfain.com
Christopher W. Bascom (VSB No. 87302)
 cbascom@spottsfain.com
SPOTTS FAIN, P.C.
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
(804) 697-2065   Fax: (804) 697-2165

*Of Counsel:*
Michael B. Hurd
 mhurd@hoveywilliams.com
Todd A. Gangel
 tgangel@hoveywilliams.com
    (*pro hac vice* applications forthcoming)
HOVEY WILLIAMS LLP
10801 Mastin Boulevard, Suite 1000
Overland Park, Kansas 66210
(913) 642-9050   Fax: (913) 642-9057

ATTORNEYS FOR PLAINTIFF